The first case on our call of the docket today, Tuesday, March 22, 2011, is Agenda Number 9, Case Number 110611A.B.A.T.E. of Illinois, Inc. v. Alexi Giannoulias, as it's still captioned. Good morning, Justices. My name is Rod Taylor. I have the privilege of representing the appellants in this matter, B.A.T.E. of Illinois and Gene Venega. To my left here, your right, is Bob Myers, who is on the Executive Committee of B.A.T.E. of Illinois. Gene Venega is our designated putative plaintiff class member. George Tinkum, at Council Table, is co-counsel along with me. And we have Dr. Rick Jones, who's with the beard, who is a veterinarian with the U.S. Department of Agriculture and serves on the Executive Committee of B.A.T.E. of Illinois. I'd like to start by going back to a time period prior to this act, the Cycle Rider Safety Training Act. And back in the 1970s, if you will, if you wanted to learn how to ride a motorcycle in this great state, all you had to have is a driver's license, be 16 years old and have the nerve, or whatever you want to call it, to throw your leg over a motorcycle and go out and practice on the highways and byways of this great state and this great country with the Mack trucks and the Kenworth hauling logs and the Chicago taxicab drivers, maybe the Springfield taxicab drivers, you get the point. That was not a good circumstance. All that changed when, in essence, a wonderful thing occurred. Motorcyclists came to the good legislature of Illinois with a proposition, a deal. The motorcyclists, in essence, said to the legislators, we'll put our money where our mouth is. We'd like to partner up with this good state. We'd like to fund rider education so we can change the way motorcycle learning occurs in this state. And, of course, the hope was that motorcycle safety foundation courses would be taught, that it would be done throughout this state, that it would be available to every motorcyclist, regardless of their financial circumstance, it would be free, and it would be professional, and we would save lives. Well, that occurred, folks. And life was good. The good state of Illinois, through its Department of Transportation, set up free rider education courses throughout most of our universities, throughout our junior colleges, and all you needed to have is a driver's license and B16. You were eligible to learn how to ride safely. Those folks that learned how to ride safely on motorcycles, and that's an intense defensive course as you can well imagine, they're the same folks that later on hopped in the cab of a semi, or hopped in the cab of a city bus, or hopped in a Chicago taxi cab. Things were better. Well, march us forward to about the year 2004. We have this, what I call, wonderful arrangement, a partnership of private citizens using their funds with the wonderful skills of government administration, like the Department of Transportation, to do the right thing. Times were tough. The state of Illinois, the legislature, looked at funds, and there were some excess funds that the motorcyclists had put into the Cycle Rider Safety Training Fund. And the government took them. Counsel, you mentioned private citizens. Is that the first question for us, is whether the rest of the race of the trust is to be considered public or private funds? I believe so, Your Honor. Justice Thomas, I believe that's correct, yes. And your position is they are private, right? Yes. Well, here's the way I see that, Justice Thomas. I see that the deal that was struck, and I set forth and we spent a lot of time looking at the history and where all this came from, but there was a lot of intention here that the state didn't have the money to provide this funding, this training, this teaching free throughout the entire state. So when a motorcyclist came in, the deal was with the state of Illinois that they would take a certain amount of that money and put it in the Cycle Rider Safety Training Fund outside the state treasury in a trust to be used specifically for that purpose. Were these funds the registration fees, I guess, that are being taken, is that correct? Yes, specifically for this purpose. Yes, Your Honor. Were these separate funds or were these normal funds that were collected by the Secretary of State in connection with all registrations prior to the time that this fund was developed? These were extraordinary funds above and beyond. The analogy I would give you, Your Honor, Justice Carmeier, is the Wisconsin case. And we have many instances in today's complicated government, you know, where we have this private government partnership type thing that's ongoing where we can do things that we can't normally afford to do and we have to have help from the citizens to come in and do it. In the Medical Society case up in Wisconsin, therein those doctors up there put money in a separate fund. It was their own deal. They administered and that was to take care of basically liability issues. They had a critical problem up there with reference to medical malpractice matters. They took it on themselves and they partnered up with the state government of Wisconsin who didn't really have the funding to do this and they did their own thing with their own money outside the state treasury in a trust just like what we have. And, of course, say what you will about the various funds that we have in the state. There are a lot of special funds, 500 or so. But this fund is extremely special. It is one of the few that is outside the state treasury. It's held in trust. It's funded by motorcyclists and all about saving lives. So no wonder it's a very special fund. As a matter of fact, I would say it's the most special fund that this state has to safeguard. And if you take a look at the legislative history down the road, and I'll get into that here in a second, but the great clash that occurred among the legislators talking about this issue, and I set all that out. But in any event, what I would submit to you justices is this Cycle Safety Training Act is elegantly simple. And here's the reason. The legislature and this court can take a look at what the legislator has done. What are they up to here? Take a look at the history. Back in 82, we set it up. We had this partnership with motorcyclists in the state of Illinois to administer this wonderful deal and everything went great until all of a sudden desperate people do desperate things. And somebody's looking around kind of like a beagle in a 40-acre field for extra money that they can use to pay down some of our debt in this good state. And they found extra money in the Motorcycle Safety Training Fund. And they grabbed it. Well, the legislature took a look at that and they didn't like that because they knew what the pact was with motorcyclists in this state. That pact was that money is to be kept holy. It is to be kept to make sure our 16-year-old sons, daughters, grandsons, and granddaughters and guys like me that are starting to rust out that are going back to learn how to ride after being absent, paying our mortgages and raising our family and trying to learn how to ride again, it's to make sure we know how to do it and to do it properly. And the legislature knew that. So they made that act very simple. How much more simple can it be to say that we're going to put this money in a trust and we all know what the meaning of trust is. We all know what the meaning of outside a trust means. You look up in Webster's Dictionary, outside means beyond the limits of. Very elementary, but I looked it up just to kind of reassure myself in the process. To be used for a special purpose. The cases that I find helpful in learning about this area, there are four cases. One from down in Kentucky. One from up in Michigan. One from way out in Colorado. And one from Ohio. The two cases that I hone in on that give me the ah feeling, if you will, about the right thing to do, is the one from Kentucky and the one from up in Wisconsin. Closest to us, for whatever that counts. I would submit to you that the law in the state of Illinois, and I've cited that on and on to you in our briefs, that an interesting concept in the Wisconsin case, quite frankly, I think it is, that case stands for the proposition that the doctors themselves were both the settlor and the beneficiary. If you recall the appellate court decision in this case, they were basically toyed with the issue as to the concept of whether or not a revocable trust was created. And those issues were debated back and forth. And we know that it's basic primer of trust law that unless a settlor reserves a right to revoke, you can't revoke it. And the dissent in that appellate court case, that dissent basically looked at the proposition and called this an education trust. I call it an education trust with a life-saving feature, is what I'd like to call it, because that's what it is. But the dissent in that case very ably noted that the law in this state wouldn't countenance an uncle from putting some money into an education fund for a nephew. And if he didn't reserve the right of revocation, that money's there. Of course the uncle could quit funding it, quit adding into it, much like the settlors of any trust could. In this instance, the judge in his dissent said to go in and sweep, the uncle to go in and sweep funds from that trust is basically akin to taking a car in a parking lot that doesn't belong to you. So I would submit to you that the language in this case is abundantly clear that we have a trust set outside the state treasury funded by private folks tendering their money to basically a partnership management operation with the state of Illinois to provide rider education that is good and competent throughout this state. That program is a wonderful program. I only wish I had statistics to share with you as to the number of lives, injury, and that sort of thing that have been saved because of that program. But it's a good one, not only from a motorcycling standpoint, but as I said earlier, just those wonderful defensive skills that are learned that can be applied whether you're driving a car, a truck, a semi, or operating the roadways of this state. It's a wonderful and good thing. To take these funds and the other case that I would note to you, the Boyce case over in Ohio, much has been made about that in the briefs as you've seen. Of course, those are always public funds. That was a settlement from the tobacco cases. Always public funds. And over in Ohio, they were in the general fund. That case is totally, totally different than our case. The one good thing I like about that case is it cites that Wisconsin Medical Society case, which is on all fours with our case. Absolutely mirror image. Another case that has come to the forefront is the Thompson reinsurance case down in Kentucky. Again, I wouldn't even pretend to compare saving lives with reinsurance issues. I know finances are important. We've got to keep things level and stable and balanced. And reinsurance is good. But to compare that with saving lives in a cycle rider safety program is no comparison, to be very frank with you. But even in that case, the state of Kentucky, again, we had funds coming from private sources being put with the state to be held in trust outside the general fund. The state of Kentucky, desperate people do desperate things. And again, looking around for some funds to pay down some debt, they swept those funds. They borrowed from those funds. The Supreme Court of Kentucky said, look, even though it's desperate times, folks, we still have to follow the rules. The rule of law still applies here. And you can't take somebody else's property without paying them for it. Mr. Taylor, let me just interrupt you just a minute. It looks like the intent of the legislature in 1992 was to create the irrevocable public trust. Can a legislative body that's changing all the time, membership can go from the original membership from 10% to zero, the bodies are changing. Can a legislative body that exists today bind a legislative body in 20 years from now to this kind of arrangement? Justice Freeman, I would say. A branch of government that exists at one time and controlling the future. Justice Freeman, I would agree that no current legislature should be able to bind any future legislature in any fashion whatsoever with public funds, with general funds, or even laws that are currently applicable. But the key here is whether or not these are public funds. Yes, Your Honor. Yes, Your Honor. These are, by our definition, private funds. And I'll get into that here in a second, and perhaps I should run into that issue right now. I have a question, Mr. Taylor. On the Ohio case, the public court there found that placing the funds outside the state treasury does not create an irrevocable trust. Now, how do our laws in Illinois differ from that? Well, one key difference there in Ohio, they have a circumstance with even when they put them in an irrevocable trust, they automatically revert back to the state general fund, interestingly enough. So that case is confusing to me, and for a good reason, would not be impressive to me if I were in your shoes with that case. And it wouldn't be impressive to me because those funds come from a tobacco settlement, okay, from a farm. There was no beneficiaries that were designated. There really wasn't a settler. And I put a little chart in our reply brief, kind of, not to be elementary, but I do that for my own purposes. But in any event, that's how we distinguish that case, Your Honor, Justice. And so I say it doesn't apply for just about every reason I can think of. And it's like Mark Twain would say, the difference between the Boyce case and our case is like the difference between lightning and lightning bug. Okay? It kind of sort of smacks of it, but it really doesn't once you kind of strip it down to its bare minimums. And again, I would urge all to look at that, the Thomas, Kentucky, reassurance case, and also the case just up the road from us here in Wisconsin, the Medical Society case that just came down. That's fresh off the print. So I would say that once this court looks at the amendment history and see the seesaw and the controversy back and forth, you know, the legislature came in and swept the funds when it wasn't in a trust outside the treasury. So they fixed it and put it in a trust outside the treasury, and they came in and swept it again. Okay? Well, let's talk about the legislative history. And I know that the rule is, unless it's ambiguous, and of course the state's indicating here that trust doesn't mean trust in this case. All right? So I think that's sort of the height of ambiguity. But if you would indulge me just for a second, I think this is really helpful to me in defining what the intent of the legislature was. If you look at the history, and we spent a long time pulling out the history of this great clash. Remember, we had a bill passed and the government vetoed it. All right? So we had controversy right off the bat. And we had Senator Leveres. His comments was, this changes a current fund to a trust fund, so the state government cannot borrow from it. It goes on. And that's, I've cited that, Volume 2, C459, Appendix P55. Senator Etheridge, he rose in opposition to the motion. What it does is set up a special fund which would be beyond the purview of the General Assembly. That's at Volume 2, C461, Appendix P57. Senator Ropp, problems we've had in the past on this particular is from time to time, these funds that have been so designated by this body have been borrowed. I think that's a very polite term. I'd say swiped or appropriated or grabbed or, you know, whatever. I don't mean to say they had bad intentions, but certainly it was a bad act. They took our money. They took the money of motorcyclists in this state in a partnership arrangement. Thank you very much, Your Honor. My time is out. I appreciate very much your attention. Thank you, Counsel. Mr. Burks. Good morning. My name is Paul Burks. I'm an assistant attorney general, and I represent the defendants in this case. I'd like to start with some of the facts that opposing counsel articulated to the court and maybe take a slightly different take on them. And the first fact I want to note is that there was always enough money in the Motorcycle Safety Fund to fund all of the classes, the entire demand for motorcycle safety classes. And, in fact, the statute, the 2004 Implementation Acts, that transferred the money to general revenue and specifically said, do not make this transfer if it will leave the fund underfunded, if it will leave the account underfunded and unable to satisfy the appropriations for that year. That's at Supplemental Appendix 6. That's the statute is included in the Appellee's Supplemental Appendix. And at page 6 of that Supplemental Appendix, you'll see that provision in the statute that says, don't deprive the people who want the classes of the classes, but to the extent there's excess in the account, that money should be transferred to general revenue. Mr. Burks, following up on Justice Thomas's prior question and the issue, why are these funds not private funds? Well, to start, they're regulatory fees, which is a classic incident of sovereignty is to collect the fee for the service that's provided by the state, in this case a motorcycle license or a motorcycle registration. They're really indistinguishable at their outset from any other fee that maybe a lawyer pays. They're distinguishable from lawyer fees because those are administered by the court rather than the legislature, but dental fees or environmental fees that a business would have to pay in order to do business in the state. Regulatory fees are just an incident of sovereignty. So when they were paid to the state, they became public funds like any other fee. Justice Carmeier asked if these were extraordinary or different funds, and our position is that they're really not. The registration fee for motorcycles is $39. I think one quarter of it goes in the motorcycle fund. A certain amount of it goes into the road fund. A certain amount of it goes into other funds administered by the Secretary of State. It's all part of a single fee that's charged to all motorcyclists who want to register their motorcycle. It's just then divvied up into different purposes by the General Assembly. Is it your position that any time money is collected by government, it becomes public funds? No, that's not our position. I would say that when money is collected as a regulatory fee, it does become public funds, but sometimes the government, for example, might be acting as an employer and might collect, say, premiums for health insurance from their employees and put those in an account that's available to pay for health insurance coverage. I would not say that that money that's paid by the employee to their employer becomes the state's money simply because the employer in that case is the state of Illinois. But certainly our position would be that regulatory fees, and for that matter taxes, are public funds after they're paid to the state. Mr. Burks, you don't believe that the statute itself expresses a clear intent to create a trust that does not have funds subject to transfer? I do not think the statute does express that clear intent. It does say the word trust fund, but this court held in 1977 a case called Lathrop that the word trust in an instrument is not dispositive of whether it's a trust or not, and you really have to look at the substance. You have to look at the elements and see if they've really been satisfied. Now, when you're looking at a public trust, what's alleged to be a public trust like this, you have to look at those elements with the presumption in mind that the legislature is generally not intending to create private rights for people when they pass statutes. Their intent, and this presumption abides in all statutes, their intent is to articulate the policy of the state until such time as they change that policy. So when we look at this instrument with that intent in mind, and you see sort of the ambiguity in terms of who's the trustee or the broad class of beneficiaries that's been identified, everybody in the state with a driver's license is the alleged beneficiary class, and you presume that the legislature is not trying to create such a private right, when you look at that kind of a broad class, it doesn't suggest that you've overcome that presumption. On the issue you mentioned, the ambiguity and the trust may not mean trust, how do you address Mr. Taylor's argument that if you look at the legislative comments, they would tend to lead to the belief that these funds were not subject to transfer? Well, I would say that there are other legislative comments that suggest otherwise. There are other legislative comments in the record that suggest that what certain legislators, at least, were trying to do was create a vehicle that could accept federal money. In fact, on page C328 of the record, you'll see a statement of the legislative history where one senator gets up and says, I don't know what everyone's talking about here. What we're doing here is the federal government has said if we don't pass a helmet law, they're going to divert our road fund to cycle safety. We're just creating an account that will allow the acceptance of that money. Other legislators said, you know, we've heard that private manufacturers would like to donate to this fund. Well, we want to make sure that those private motorcycle manufacturers or individuals can donate to the fund, so we're going to set up an account that will be able to accept those funds. So I think the legislative history, Mr. Taylor, he relied on people who were opposed to the bill, for the most part. I mean, people who said don't do this, the sky is going to fall and the legislature will never be able to touch these funds again if you do it. Those are the comments on which he was relying. Those people, in fact, lost. And I think if you read the legislative history as a whole, I'm not saying that some people didn't think so, but if you read it as a whole, it's somewhat indeterminate, and different legislators might have had different views of the outcome of this particular statute. What about the fact that they not only designated it as a trust, but they provided that the money should be moved out of the state treasury? Well, outside of the state treasury is a term in state finance that means the treasurer is often not the custodian and an agency might be the custodian of the account rather than the treasurer. Sometimes the treasurer winds up the custodian, even though it's outside the state treasury. And the agency that then is the custodian of that account has to monitor it, keep the books for the comptroller. But what outside the state treasury doesn't do, and I think the Ohio court spoke to this, it doesn't change the General Assembly's authority over the money. The General Assembly doesn't lose the right to allocate that money for whatever public purpose they think is most necessary at the time simply because they placed it in one account rather than another account. They placed it with the treasurer or they placed it with the Department of Transportation. At all times, it's the General Assembly's prerogative. They have plenary power over the funds. So that is a distinction. It has some meaning for how funds will be used and who's going to administer them and how the comptroller keeps the books on them, but it doesn't have any particular importance for when you're talking about legislative power. When you're talking about legislative power inside or outside the state treasury, it doesn't matter what matters if it's public funds or private funds. I think that makes a significant difference. Is there any indication that they intended them to be private funds? I don't think it is an indication because there are several funds outside the state treasury. And most of them are public funds. It's not a term that means that the funds are private, which is what the Ohio court said as well. The Ohio court said, look, just because the General Assembly moves funds outside the state treasury doesn't mean they're giving up their authority over those funds. And I think the reason they moved the funds outside the state treasury had really more to do with the acceptance of private contributions. Creating a fund where if people wanted to donate private money into that fund for a specific purpose, it would go directly to the Department of Transportation. It wouldn't have to go through the treasurer's accounts, and it could be used for that purpose. So I think that it satisfies that intent as well. And really, I think this is really where the doctrine of constitutional avoidance has some force right now because when you're looking at the statute and you're saying, well, what did the legislature mean by outside the state treasury? Well, they could have meant we want to create rights for this broad class of beneficiaries, or they could have meant we want to create a fund where private people can donate and where federal funds can be deposited. If they meant the former, then we have a constitutional question. We have the question that Justice Freeman mentioned before, which is can the 1992 General Assembly pass a statute that then is going to bind the 2004 General Assembly to use that money for a specific reason? And that constitutional question is the one that the appellate court ruled on and ruled that they could not, that the 2004 General Assembly could modify that statute and use the funds for another purpose. The Colorado court addressed that issue and said the same thing. The Ohio court reached that same conclusion. So in order to avoid that constitutional question, and when you have two plausible interpretations of a statute, which is broad on its face, I think we take the one that doesn't present that constitutional question. If we disagree with your argument in the appellate court analysis, is it as simple a matter as, and if the legislature disagrees with us, is it as simple a matter as the legislature passing enabling legislation that would allow for the transfer? The legislature could pass a statute, and I don't think plaintiffs dispute this, that abolished the Motorcycle Rider Safety Fund and moved all the money out or amended the Motorcycle Rider Safety Fund. Their position is that it should have been done first. Their position is that it should have been done first. But this court has upheld transfers on numerous occasions without first modifying the enabling statute. And that's because there's nothing in the enabling statute that says don't transfer the funds. So it would have been the 2004 General Assembly would not have known that such a modification was required before they could transfer money. And, in fact, to the extent that they anticipated that in one of these funds there might be some language that would be problematic to a fund, they did say in the statute notwithstanding any laws to the contrary, which I think was intended to say, look, we don't know. Certainly none of these funds say don't transfer, but if there's anything in them that might be construed as such, we want to override that. So you do have a legislative intent to transfer this money regardless. Mr. Taylor had indicated that this is an extremely special fund, using the words trust and outside the state treasury. Are there other such funds that the legislature has created that are in existence now? There are dozens of funds that are called trusts. And outside the state treasury? Trust funds outside the state treasury, there's somewhere between 25 and 30 of those funds that have that designation. They fall into a number of different categories. They're very different in substance. Some of them contain health insurance premiums. One of them contains money collected by the state by parents who owe money to their children, support to their children. The state has an agency that collects that money, passes it on to the children. Can those funds be swept? I use that fund as an example of what a real trust fund would look like. You have a defined class of beneficiaries in terms of the children. You have a defined race of money that belongs to a private party, and the state's only role is that of a trustee to move that money to the private individual at the end. That money I don't believe could be swept. I believe it's private money. Other funds, however, are similar to this one where they use the language but in a much more generalized way. So does it really come back again to whether these are public or private funds? It does. And I think you have to look at the substance of the statute rather than the label given to it. And that's what this court said in Lathrop. They said, look, the word trust isn't dispositive. Look at the substance of the instrument. And I think when you look at the substance of this instrument, you see the money comes from public sources, comes from registration fees, is allocated for a broad swath, a majority of citizens. It doesn't look like trust. It doesn't look like it's overcoming the presumption that the court, that the state was simply trying to pass a policy, a beneficial policy. You indicated that, one more question. You indicated that the purpose of creating this was to allow for grants or gifts into this fund for cycle rider safety training. If those funds came into this trust, could those be swept by the legislature? No. Private funds, private donations for a specific purpose would be private monies. They would not be regulatory fees that are allocated by the General Assembly. They would be money. And there's a statute called the Public Use Trust Act, and there's some legislative history that indicates one of the sponsors was trying to copy that, to make this fund similar to the Public Use Trust Act. And the Public Use Trust Act allows agencies to accept private donations for a specific purpose and then use that money solely for that purpose. So I think the private money would be protected, and that was it. Yeah, I want to understand your argument on the legislative debate. You mentioned that there were comments made by legislators that indicated that we're not going to get the federal money since we don't have a helmet law in the state unless we have this safety program. Why wouldn't that err to Mr. Taylor's argument that then the purpose of this fund was exclusively for safety or promoting safety without transfer, without the ability to transfer the funds? Well, I don't think it would support his argument because what the state legislature set up to handle federal funds, the mechanism they set up to handle federal funds, which would have restrictions and requirements on how they would be spent, would not apply to their own plenary authority over state funds. Because they're setting up a fund that says, okay, the federal government's got all these caveats and restrictions and we want to make sure we abide by those, so we're going to have a fund here. But I don't think it's a fair inference to say, in order to do that, we're also going to limit our own authority. We're going to stop ourselves from taking registration fees over which we have plenary power and using those for a different public purpose. So I don't think that the one matches the other, so to speak. Opposing counsel did rely on two cases in particular, the Kentucky reinsurance case and the Wisconsin case, so I would just like to address those. Both of those cases are very similar, actually. They're quasi-contractual arrangements for insurance contracts, essentially. The Kentucky reinsurance case is those who provide workers' comp insurance in the state of Kentucky contribute to a state fund, and if they go bankrupt or if they don't have enough money to pay their claims on their workers' comp insurance, they have excess insurance from the state, essentially. The Wisconsin statute is very similar. It's medical providers. They buy malpractice insurance in a statutorily set limit, and then they make contributions to the state for excess insurance. If they're subject to a judgment in excess of the malpractice insurance that they've purchased, they get excess insurance from the state fund that they've contributed to. Now, those quasi-contractual relationships, those funds could not be swept. The Wisconsin court and the Kentucky court said you can't sweep from those funds. And what they reasoned was when you look at the specificity of those accounts, you have specific providers, specifically named beneficiaries, those who provided to the accounts, provided money into the funds as the specific beneficiaries. The legislature set up a separate body to serve as the fiduciaries of those accounts. It didn't just allocate the money like we do registration fees through the treasurer's office to a specific state agency. They set up a separate body of trustees. In the Wisconsin case, they called it an irrevocable trust. They identified the medical providers as specific beneficiaries of the trust. And so you have what are essentially contractual, quasi-contractual arrangements for insurance coverage. That's what those are. What we're looking at here is this is not a quasi-contractual arrangement. When they get their motorcycle registrations or their motorcycle license, they pay the $39 fee. Otherwise, they can't drive their motorcycle in the state of Illinois. And once that money goes to the state, the state allocates it to a number of different purposes. And in addition to the purposes for which the $39 is allocated, the state also through general revenue pays for traffic lights and roads and medical care and a number of other things that motorcyclists like the rest of us use. So if the state wants to move some of that $39 into general revenue for other purposes, that has been held to be well within their authority. And the only thing that would distinguish this case from the numerous cases in the past where the state has transferred funds and it's been upheld would be the designation of this account as a trust. And that was a statutory designation. That was a designation made by a prior General Assembly. And presenting then the constitutional question, which is can that prior General Assembly do that? Can they take that money in 1992 and say forevermore where it's going to be used for this purpose? And when the Ohio Supreme Court and when the Colorado Supreme Court and when the appellate court in this case looked at that question, they concluded that they could not. But I would really urge the court to take the approach that the appellate court took here, which is to construe the statutes so as not to render either one of them invalid. And what the appellate court did here is they said, well, it's implicitly a revocable trust. And when the General Assembly goes forward and makes its intent clear to shift money from one account to the other, they've revoked that trust. That would be, I think, a valid approach. It would satisfy the doctrine of constitutional avoidance. It would leave the two statutes enforceable and read them in peri materia, which I think is the best approach. And the alternative, an alternative approach is to look at that statute, the 1992 statute, and say the word trust here was really used inexactly. And when you look at this statute with the presumption that the legislature is not trying to create vested rights, you find that it's not really an irrevocable trust that you would find in a private instrument, but rather just a statute that articulates really the policy of the state and the priorities of the state at that time. There are no further questions. Thank you. Mr. Taylor. Yes, Justice. If we follow the legislative footprints, those prints lead us to the altar of legislative intent in this case. I had enough time to finish a few other things concerning that intent, but we've got Representative Black, and I couldn't have said it better, and this is a quote. Let us not cloud the issue any more than it already has been clouded, okay? And I would submit to you that's what occurred in this case. My very able opposing counsel has written a great brief that I would, with all due respect, suggest has done a masterful job of clouding something that is unbelievably simple when you look at the legislative footprints in this case. I will go on. Finally, the Cycle Rider Safety Training Fund was created because of a voluntary request by the motorcyclists themselves to fund this very program. Representative Clem said that, and that's at volume 2, C452, appendix page 48. I think that it is clear that when you look at the way we started out, and back in the 80s that was the beginning of this kind of public-private cooperation among citizens who saw a need and recognized there weren't money out there to fund it. What's your response to Mr. Burke's comment that they're only transferring the excess? Justice Thomas, I would say this to you, that a taking is a taking, okay? And just because you may allow a car to be borrowed by someone, to use the appellate court's analogy, it doesn't allow that person to keep it. So if a future legislature decides to adjust the funds up or down, perhaps we've collected too much money. Well, they can adjust the amount that the motorcyclists are paying. They can bring it down. You know, who knows how you can exactly pinpoint that. It depends on how many people sign up. That's a problem that government has, is trying to figure out and estimate the best way to do that. And the fair way of doing it is, is the legislature can go in and simply adjust the amount that it's collected. And if they need more, and we have more and more people coming in to be trained in this program, then we have to collect more from the motorcyclists. And that would occur. That's what we signed up for. That's to be encouraged, that whole arrangement. That's a good thing in all states, it seems to me, to give this tool to not only citizens of this state, but the legislators. You know, we can apply that in many other instances other than just cycle rider safety training funds. I mean, your imagination can kind of lead you down that path. And this one, it's a very holy one to me in my judgment. Opposing counsel has done a very good job in taking a look at these funds and saying, well, funds are funds and basically there isn't much in the way of difference. And in the state's brief, they circle out two funds. The Clean Water Fund and the State Boating Act Fund. And they say, well, same old, same old with the Cycle Rider Fund. And I worked real hard to try to figure out how to make this elegantly simple in my own brain before I could submit it to you folks. And I put in a chart in our reply brief. Clean Water Fund and Safety Boating Act Fund. And I compare them side by side in the brief, page four. Number one, the two funds that are cycled out by the state saying, well, it's the same old, same old. It's the state money and they can grab it and they can use it wherever they want. Those were created as special funds only. They weren't trust funds. The Cycle Rider Safety Training Fund was created as a trust. And I've already bored you to death going through the 82 and the 92 amendments and the controversies and the problems we had there and all the legislative history and the battle. I mean, if there's anything that's been fought and erred, certainly this Cycle Rider Training Fund has been debated and debated. And it's because there are a lot of people in this state, a lot of motorcyclists who feel very intent. And the beneficiaries are motorcyclists who want to make sure their sons, grandsons, granddaughters and daughters and themselves can go back and make sure they're up to speed in today's very complicated, fast-paced world and the interstates, et cetera. The second thing on the Clean Water Fund, they were placed inside the state treasury. Our funds were placed outside. And remember, I always like to look upwards. I still have my old college dictionary from 1969, Webster's College Dictionary, 7th edition. And I looked up outside just to make sure I thought I pretty sure I knew what it meant. But it means, and it was better than I thought to be very frank with you. I always learn something when I go to the dictionary. Outside the limits of the treasury. Gosh, folks, how much more simple and elegantly simple can it be than that? For good reason. The legislatures knew that if they were given an opportunity and desperate people wanted to do desperate things, they'll go in there and grab that money. And that violates that partnership arrangement that this state, that pact with motorcyclists, for a very holy purpose. I'll go on. In my chart, the Clean Water Fund and the State Boating Act Fund, neither one of them have beneficiaries. Neither one of them. Ours does. It names residents 16 and over with a driver's license and wanting cycle training. The very element, ingredient of what we're all about. And we signed on for that program. These folks aren't here for their health. I mean, they're here as volunteers to make sure things come about in this state. It's a better deal.  We'd like to continue with that. And that's what the legislatures bought into. Item 4, distinction between the funds cited by the state. Those funds have exceptionally broad purposes which benefit no particular group of people. Our cycle training fund limits the use of the funds, limits, to providing cycle training to the beneficiaries I just identified. And then the fifth comparison that I put in that chart for you. The statute provides that the money passes through the state treasury in the Clean Water Fund and the State Boating Act Fund. Nay so in our instance. And for good reason. We'd already been to the school of hard knocks as to what would happen to us. Motorcyclists from all over this state. And there's about 25,000 in the state of Illinois. We came down and said, hey, we need to do this correctly. We need to make sure that these funds are used. If we're going to pay the bill for this, and we do, okay, we do. We are the settler just like up in Wisconsin. We pay those monies. All right. That statute carefully notes that the money is to be placed outside, my favorite word for the week, the state treasury. So folks, I would say that this case strikes at the very heart of our property rights. We can't just say, well, there's a little money left over here. Let's go take that. That strikes at, you know, the taking provision, Article I, Section 15 of the Illinois Constitution. We put it first. You know, even the U.S. Constitution, it's Amendment 5, okay? Mr. Taylor, before your time is completely up, if you feel that the legislature can adjust the flow of the money coming into this account, if too much is accumulating, then why can't a sweep accomplish the same thing? What's the difference? Well, the difference is, Justice Freeman, is that it is private money. It is private money for the specific purpose of that trust, for the purpose it's set forth in that legislation, and the appropriate remedy there is to adjust the amount that's collected. It can't be adjusted by the sweep? Well, that would be taking money. That's like getting no change back. That's like going to McDonald's and putting down your 20 and the bill's $15, and the McDonald's guy says, okay, nice to meet you, and doesn't give your change back. That's the analogy, very elementary, I realize, but that's the analogy I would get. It is not McDonald's money. It is not the legislator's money. They declared that. That is their intention here, and to allow a sweep basically strikes at the very premise of the rule of law in this country, and that is the sacrosanct element of contract, agreement, and taking of property. So, sure, I would say it's convenient. As I've said before, desperate people do desperate things, and I understand there's a need to look in every crack and crevice in this state for funds, but once we start violating the very basis of our being, we have just stepped backwards in this country, and I think in this instance, if you could pick one act that stands above all the rest of them for all the obvious reasons I've suggested and for all the good reason it exists, it's this one, and a taking here means they can take further, in my judgment. Would retirement funds be at risk? Would insurance deductions be at risk? Would workman's compensation premiums and funds be at risk? I mean, the whole list would come to the fore. I think the legislature wanted to be taken at their word, okay, and that in this instance, you may conclude. Thank you, Justice. In this instance, and to honor your question, I understand the ease with which that would provide some relief today, and if I were a legislator, you know, we have to look at all those, but in this case, with this fund, outside the treasury, in trust, paid for by and on behalf of motorcyclists, that should be honored. I submit to you, if we had the legislature here today from back there, they'd all say, Rod Taylor, you're right as rain. Thank you very much, Your Honor. Thank you. Case number 110611, abate of Illinois Incorporated v. Alexi Janulius, is taken under advisement as agenda 9. Mr. Taylor, Mr. Burks, we thank you for your arguments today.